Aaron Greenspan (*Pro Se*)
20560 Shelburne Road
Shaker Heights, OH 44122-1941
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE: Digital Millennium Copyright Act [Subpoena] to Copyright Agent, Namecheap, Inc., Legal Department | Case No.: 1:18-mc-00071<br><br>District Judge Christopher A. Boyko |

## MEMORANDUM IN SUPPORT OF MOTION FOR CONTEMPT SANCTIONS

### I.   Introduction

Requestor Aaron Greenspan ("Requestor") has filed the instant motion due to an extraordinary set of circumstances involving clear and willful attorney misconduct. The three attorneys involved, all working on behalf of Digital Millennium Copyright Act (DMCA) Subpoena Recipient Namecheap, Inc. ("Recipient"), were apprised of the situation giving rise to the subpoena as early as April 2018. In a remarkable display of perfidy, they consented to electronic service of the subpoena—as is common and generally necessary for DMCA communications[1]—read the subpoena, discussed the subpoena's specific terms with Requestor, denied the existence of responsive materials, admitted the existence of responsive materials, insisted that Requestor didn't truly want the responsive materials, generally ignored the subpoena

---

[1] 17 U.S.C. § 512 makes numerous references to "electronic mail," i.e. e-mail, in the statutory text. Especially given the purpose of the Act, Congress clearly intended DMCA communications to be fast, effective, and as the Act's name

and waited for the response deadline to lapse (which it did), engaged outside counsel to claim that Recipient had no "record" of the subpoena that it had already discussed in writing, realized that Recipient's in-house counsel was *not even licensed to practice law in her home state*, re-engaged outside counsel to continue the discussion via licensed attorneys by inventing a problem with service of process, consented *again* to electronic service, and ignored the reasonable, extended deadline set by Requestor a *second* time.

As of the filing of this motion, Recipient has willfully failed to comply with the subpoena and demonstrated incredible bad faith.

## II. Brief Statement of Facts

1. Requestor Aaron Greenspan has been the target of a campaign of on-line harassment for approximately two years. Various copyrighted photographs of Requestor, Requestor's family, and even one of Requestor's work colleagues have appeared on numerous websites, sometimes pasted onto pornographic images, with the goal of shaming Requestor.

2. Digital Millennium Copyright Act (DMCA) Subpoena Recipient Namecheap, Inc. ("Recipient") is a website hosting company and domain name registrar. Recipient provides website hosting services for Scott Breitenstein, a resident of Dayton, Ohio, referred to in various media articles as an "internet terrorist" and "the worst man on the internet."[2] Mr. Breitenstein depends upon a variety of hosting providers, including but not limited to Recipient, to keep his hundreds of revenge pornography and gripe sites on-line.

3. Most of the websites where Requestor's copyrighted photographs appear on-line both belong to Mr. Breitenstein and are hosted by Recipient.

4. Requestor filed numerous DMCA takedown requests with Recipient prior to requesting that the Court issue a subpoena in this matter:

---

[2] *See* the January 12, 2016 *Splinter News* article, "At home with a revenge porn mogul," https://splinternews.com/at-home-with-a-revenge-porn-mogul-1793854053.

MOTION FOR CONTEMPT SANCTIONS      4      1:18-mc-00071

| Date | Ticket No. | Distinct Infringing URLs |
|---|---|---|
| December 30, 2017 | BAG-347-32491 | 1 |
| January 14, 2018 | CKG-878-69229 | 32 |
| April 28, 2018 | GCZ-650-80973 | 7 |
| June 16, 2018 | KSS-207-38494 | 182 |

5. On April 4, 2018, Requestor was granted a temporary restraining order (TRO) in the Superior Court of Santa Clara County, California, Case No. 18CH008067, against the individual primarily responsible for posting Requestor's copyrighted materials on Mr. Breitenstein's sites. Nonetheless, the posts, and therefore the copyright infringement, continued, often at a pace faster than takedown requests could be filed.

6. On April 26, 2018, Requestor e-mailed outside counsel for Recipient, Eugene Rome, asking for his assistance with a DMCA takedown notice in compliance with 17 U.S.C. § 512. Mr. Rome wrote back, "Your e-mail is received. We'll be reviewing it in short order."

7. Mr. Rome did not review the request in short order. On May 22, 2018, Requestor followed up with Mr. Rome, pointing out via e-mail, "It has been nearly a month and you have not responded to my request."

8. Later that day, Mr. Rome's colleague, Ms. Sridavi Ganesan, wrote back via e-mail, "We have reviewed the TRO you referred to and the posts located on blacklistreport.com. Unfortunately at this time, Namecheap is unable to take down the content to which you refer and/or the website in question. However, Namecheap will comply with a court order requiring it or the poster to take down the content. If you are able to obtain such a court order, please forward it to us."

9. On June 19, 2018, Requestor was granted a permanent restraining order against the individual primarily responsible for posting Requestor's copyrighted materials on Mr. Breitenstein's sites. Once again, despite the restraining order, the posts, and therefore the copyright infringement, continued.

10. Requestor filed his request for a DMCA subpoena with this Court on July 24, 2018 to ascertain the IP address(es) and/or DNS hostnames belonging to the individual(s) posting content on Mr. Breitenstein's sites hosted by Recipient. The Court issued the subpoena the same day.

11. Requestor filed the subpoena request cognizant of the fact that one of the posters of copyrighted materials could in fact be Mr. Breitenstein himself—Recipient's client.

12. Requestor e-mailed the subpoena to Ms. Ganesan on the same day it was issued, July 24, 2018.

13. Via e-mail, Ms. Ganesan promptly and clearly replied, "Mr. Greenspan. Please direct all your correspondence to legal@namecheap.com directly. Our firm is not handling this matter. Thank you." Her e-mail contained no other instructions apart from a boilerplate disclaimer regarding confidential communications.

14. Requestor then e-mailed the subpoena to legal@namecheap.com. Requestor's e-mail message containing the subpoena was received, and a reply ensued about an hour and a half later from an unidentified individual writing from the "Namecheap Legal" account. At 5:31 P.M. EDT, this individual wrote:

> Dear Mr. Greenspan:
>
> Thank you for your email. Namecheap does not collect or retain the information you have listed in the subpoena. So, unfortunately, there is nothing that can be produced.
>
> Please note that we are not a Copyright Agent in law or in fact. Under the DMCA, we provide contact information so that a compliant DMCA Takedown Order may be directed to us and we then serve it on the party alleged to be infringing. The DMCA provides strict guidelines on what must be included and only provides for the removal of content. You may find additional information here.
>
> Best regards,
>
> Namecheap Legal . Namecheap, Inc . E legal@namecheap.com . W namecheap.com

15. The message from "Namecheap Legal" contained three false statements and one additional misleading and/or false statement. Recipient does, in fact, **collect** *and* **retain** the information listed in the subpoena. Therefore, there are **several** responsive materials that can be produced. Additionally, though "Namecheap Legal" is not a DMCA Copyright Agent, according to the United States Copyright Office, Recipient does have a listed DMCA Copyright Agent, Sergio Hernandez, whose listed e-mail address is legal@namecheap.com.[3]

16. Eight minutes later, through an e-mail message to legal@namecheap.com, as well as Eugene Rome and Sridavi Ganesan, Requestor informed Recipient of these falsehoods, and of the contents of Recipient's own website, which clearly states that the company retains server logs, and even provides helpful instructions on how to download them.

17. Nine minutes later, Requestor received an e-mail from Jennifer Suarez, who informed Requestor, "Your interpretation is incorrect." Requestor's interpretation was not incorrect.

18. Jennifer Suarez registered the domain name "americanwildhorses.us" on November 4, 2015, and at that time provided a mailing address of 10293 Window Rock Trail, Reno, Nevada 89511, with an e-mail address of jlsuarez9@yahoo.com, suggesting a middle initial of "L."

19. Jennifer Lynn Suarez also lists the 10293 Window Rock Trail, Reno, Nevada 89511 on her Avvo attorney profile located at https://www.avvo.com/attorneys/89511-nv-jennifer-suarez-578138.html.

20. Jennifer Suarez is not licensed to practice law in Nevada. She does not appear in the State Bar of Nevada attorney directory at https://www.nvbar.org/find-a-lawyer/?usearch=suarez.

21. Although she presents herself as in-house counsel for Namecheap, Inc., Ms. Suarez also works as a freelance legal consultant through a separate Las Vegas-based firm, Timbit Consulting LLC, that she runs with Recipient's outside counsel, Eugene Rome. This, among

---

[3] *See* https://dmca.copyright.gov/osp/publish/history.html?search=namecheap&id=4c98460904f89aaf7a0f0403163e68f5.

other factors, renders Ms. Suarez ineligible to make use of Supreme Court of Nevada Rule 49.10, which allows in-house counsel who work exclusively for a single Nevada-linked corporation to practice law without registering with the Nevada Bar for a $250 fee.

22. Namecheap, Inc. is neither domiciled in nor qualified to do business in Nevada.

23. Regarding Ms. Suarez, the Timbit Consulting LLC website's "Team" page at http://www.timbit.co/new-page/ states in part, "*As a lawyer*, SM or SVP, Jennifer has worked at other companies such as CBS, Inc, Deloitte, Accenture, and *Namecheap*" (emphasis added). The same page displays Eugene Rome's photograph next to hers.

24. While unlicensed to practice law in Nevada, on July 24, 2018 at 6:40 P.M. EDT, Ms. Suarez sent a second e-mail concerning the subpoena to Requestor containing numerous falsehoods and misleading statements. In this message, Ms. Suarez first contradicted the prior assertion that server logs were neither collected nor retained by acknowledging that server logs *do* exist. As she wrote, "The logs are IP addresses of any/all visitors who clicked onto the site. There is not a way to link any of the IP addresses or logs to an upload or to a post with your name – as directed by the subpoena."

25. Server logs are easily and routinely linked to particular uploaded files or posts with particular strings of characters.

26. Ms. Suarez further stated, "We reiterate again that the information requested in the subpoena cannot be provided." As a technical matter regarding Recipient's servers, this statement was false. She concluded her message with, "If you decide to submit a DMCA Takedown and/or a court order against the site(s), you may direct it to us at legal@namecheap.com and we will handle it directly."

27. At this point, both inside and outside counsel for Recipient had directed legal communications from Requestor, including but not limited to the subpoena, exclusively to legal@namecheap.com by e-mail and not to any other address via any other medium.

28. On August 6, 2018 at 2:05 P.M. EDT, Requestor informed inside and outside counsel for Recipient, "Your subpoena response in Northern District of Ohio Case No. 1:18-mc-00071 was due over an hour ago (today, August 6, 2018 at 1:00 P.M. Eastern Time). Barring the immediate receipt of the server logs in question, I plan to instigate proceedings to have you, Sridavi Ganesan and Eugene Rome held in contempt of court."

29. On August 6, 2018 at 8:17 P.M. EDT, despite previously stating that her firm was not involved with the matter, Ms. Ganesan replied, claiming that the subpoena had never been served.

30. The following day, on August 7, 2018, in response to Requestor, Ms. Ganesan attempted to clarify her position, stating via e-mail, "Our firm has recently accepted representation of this matter. Please note that email service of a subpoena is appropriate if the receiving party agrees to accept service of the subpoena. Neither Namecheap nor my firm accepted service of the subpoena you forwarded to us. Discussing or even reading the subpoena does not equate with acceptance of service. Therefore, the subpoena was not properly served. However, as a courtesy, my firm will today agree to accept service of the subpoena by email. Please forward me a copy of the subpoena again."

31. Ms. Ganesan further proposed her own compliance deadline of August 17, 2018, which Requestor rejected on account of an August 14, 2018 9:00 A.M. PDT court hearing in the aforementioned restraining order proceedings. Ultimately, while categorically rejecting her arguments, Requestor sent Ms. Ganesan a copy of the subpoena a *second* time by e-mail as a courtesy, and extended the time to reply until August 10, 2018 at 1:00 P.M. EDT (four extra business days).

32. Locating, downloading and transmitting the log files requested would require no more than approximately two hours of labor.

33. Recipient has not filed any motion to quash the subpoena.

34. Recipient has failed to comply with the subpoena.

## III. Argument

### A. Recipient Namecheap, Inc. Offered No Legitimate Reason For Ignoring The DMCA Subpoena

"A federal court has the inherent power to impose sanctions against a party or non-party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *American Trust v. Sabino*, 230 F.3d 1357, *1 (6th Cir. 2000) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 46-50 (1991); *Corder v. Howard Johnson & Co.*, 53 F.3d 225, 232 (9th Cir. 1995))." *Clapper v. Clark Development, Inc. et al*, Case No. 5:09-cv-00569 (N.D. Ohio, April 15, 2014). Here, contempt sanctions are warranted because Recipient, through its counsel, has indeed clearly acted in bad faith, vexatiously, wantonly, and for "oppressive reasons."

At no time did Recipient offer up even a single valid objection to the subpoena.

Scope was not an issue. The subpoena submitted by Requestor is limited in scope; Exhibit A to the subpoena (ECF No. 1-2) lists only five domain names for which Requestor asked for a limited portion of HTTP/HTTPS server logs. Recipient's website makes abundantly clear that Recipient creates and retains such logs—and even makes them available to its customers for instant download through control panel software called cPanel. See "How can I check my website access logs?" at https://www.namecheap.com/support/knowledgebase/article.aspx/9563/29/how-can-i-check-my-website-access-logs. As Requestor communicated to Recipient via e-mail on July 24, 2018, that specific support web page states:

> "Using the Raw Access Logs menu in cPanel, you can check the traffic coming to your website before it is turned into a report by the statistics software. It is a great functionality to take a closer look at the type of the requests your websites are getting..."
>
> "If you wish to download archived logs which are stored in the account home directory, click on the corresponding one in the Archived Raw Logs section..."

While Recipient's unlicensed in-house counsel attempted to convince Requestor that the server logs described therein were somehow *different* than the type of server logs required by the subpoena, this attempt was duplicitous and deliberately misleading. Requestor has twenty years of experience managing both Linux and Windows-based servers and is familiar with server logs of many varieties and with cPanel in particular. The server logs described on the "How can I check my website access logs?" page are in fact the precise type of HTTP/HTTPS server logs, sometimes referred to as "Apache logs," required by the subpoena.

Timeframe was not an issue. Not until after the deadline had passed did outside counsel Sridavi Ganesan insist that she required more time to comply, and not for any particular reason related to the contents of the subpoena itself.

Procedural matters were not an issue. Recipient properly received numerous DMCA takedown request notifications from Requestor prior to the issuance of the subpoena, pursuant to 17 U.S.C. § 512(h)(2)(A), which were filed with the Court. *See* ECF No. 1-2.

Technical capability was not an issue. Requestor even recommended specific UNIX commands to Recipient that could help Recipient comply with the subpoena, and provided the option of responding with each site's entire log file for Requestor to search through manually.

Aside from its attempts to dissuade Requestor from continuing with the request, the only issue raised by Recipient was the issue of service of process, but again, only after the deadline for a response had expired, and in bad faith.

**B.    Recipient Namecheap, Inc. Consented to Electronic Service of Process**

Almost as soon as Requestor was issued the subpoena by the Clerk of Court, Requestor sent it via e-mail to Ms. Ganesan. As described above, upon receiving the subpoena in her inbox, Ms. Ganesan quickly replied and instructed Requestor to "Please direct all your correspondence to legal@namecheap.com directly," as she claimed not to be "handling this matter." Whether that statement was true is impossible to know, as Requestor had last corresponded with Ms.

Ganesan about the same underlying matter on July 13, 2018, and at that point her firm *had* been handling the matter.

Nonetheless, Requestor complied with Ms. Ganesan's wish and sent the subpoena digitally to legal@namecheap.com, which is the stated e-mail address for Recipient's DMCA Copyright Agent on file with the United States Copyright Office. When "Namecheap Legal" replied via e-mail with its false and misleading discussion after having examined the subpoena, it did not suggest that any other method of notice, service or communication was required for compliance.

In fact, e-mail service of DMCA subpoenas issued pursuant to 17 U.S.C. § 512(h) is commonplace and for most content providers, preferred. The reasons for this are at least threefold: e-mail service is more efficient, less costly, and in the context of a law that requires speed, faster.[4] Furthermore, owing to the nature of the law, the underlying subject matter is necessarily also digital. In such circumstances, even service of process via Twitter has been permitted, once again highlighting the core function of notice. *Democratic National Committee v. The Russian Federation et al*, Case No. 1:18-cv-03501-JGK (S.D.N.Y., August 6, 2018).

When Ms. Ganesan herself indicated that the subpoena should be e-mailed to legal@namecheap.com on July 24, 2018, she consented to electronic service of process on behalf of her client. When she later claimed that she had not on August 6, 2018, the single step she took to formally "accept" service of process was exactly the same as the single step she took on July 24, 2018: she received the e-mail in her inbox. In fact, in an effort to maintain the illusion that her client was blameless, she insisted that Requestor re-send the exact same message she had already received to the exact same e-mail address so that she could pretend that the clock had reset.

---

[4] *See* the December 16, 2009 article "Is Personal Service of Civil Subpoenas Coming to an End?", https://www.serve-now.com/articles/64/is-personal-service-of-civil-subpoenas-coming-to-an-end.

### C. Recipient Namecheap, Inc. Was Indisputably On Notice Of The DMCA Subpoena On July 24, 2018

Service of process for subpoenas is typically governed by Federal Rule of Civil Procedure 45. When similar disputes have arisen over proper service in the past, numerous federal courts have viewed such games as Ms. Ganesan's as a vexatious waste of time, emphasizing that the concept of notice—and not procedural technicalities—are the essential point of service of process. "Rule 45 itself does not expressly require personal in-hand service, and a practical appreciation for the fact that the obvious purpose of Rule 45(b) is to mandate effective notice to the subpoenaed party, rather than slavishly adhere to one particular type of service." *Hall v. Sullivan*, 229 F.R.D. 501, 505 (D. Md. 2005). "Rule 4 provides additional support for the conclusion that Rule 45 does not command that there be personal, in hand, service of a subpoena. The former states in relevant part, that an [']individual...may be served in a judicial district of the United States by delivering a copy of the summons and complaint to the individual *personally*....' As the Rule makes clear, when the drafters of the Federal Rules wanted to require 'personal service' of a pleading, they were able to do so unambiguously. By contrast, in Rule 45, the drafters merely provided that the subpoena be 'deliver[ed] . . . to the named person'" (footnotes excl.) *In Re: Miscellaneous Subpoenas*, Case No. 3:16-mc-00003-MAM, (D. South Dakota, August 1, 2016). "She received the subpoena on May 13, 1994, but waited until today to properly move this court to quash on the grounds that she was not served by personal delivery. The court now holds that personal service is not required by Rule 45(b)(1)... [I]t would serve only to torture the rules and to drive up the expense of litigation to construe Rule 45 as forbidding service by certified mail." *Doe v. Hersemann*, 155 F.R.D. 630 (N.D. Ind. 1994).

The debate herein regarding e-mail in the context of the *Digital* Millennium Copyright Act is fundamentally the same as the prior debates in the above cases concerning the very last-millennium idea of service via Certified Mail. Having cited no case law whatsoever, Recipient is

attempting to use a technicality in Rule 45 that does not even exist according to multiple courts over a period of decades to squeak out of her client's obvious obligation to respond to a flawless federal subpoena. Even if Recipient does find cases to support its contention that personal service was necessary even after Recipient acknowledged receipt and understanding of the subpoena by e-mail, the DMCA does not use the word "service," but rather, its authors chose the more liberal word "receipt" in the statement "Upon receipt of the issued subpoena..." 17 U.S.C. § 512(h)(5).

Tellingly, in her August 7, 2018 message received at 8:59 P.M. EDT, Ms. Ganesan wrote, "Please forward me a copy of the subpoena *again*" (emphasis added). Counsel does not argue that she failed to receive the subpoena the first time on July 24, 2018. Nor does she argue that Requestor's detailed e-mail correspondence about the subpoena with "Namecheap Legal" and Jennifer L. Suarez never happened. *See* Exhibit A. Instead, she has attempted to wrongly put the onus on Requestor to re-serve an already served document for lack of any better argument.

### D. Recipient's Numerous Lies Concerning The Subpoena Are No Accident

Most internet service providers view subpoena compliance as a banal necessity that has no direct impact upon operations, best handled as quickly and inexpensively as possible. Not so with Recipient.

At every step of the way, since April 2018, Recipient has blocked, dodged, or deliberately stonewalled Requestor's reasonable requests for assistance and/or information, going so far as to tell bald-faced lies about the company's log practices contradicted by its own public materials. Recipient employed an unlicensed attorney to compound those lies—at act that may have been unlawful in more ways than one. And that unlicensed attorney runs a separate business in the same state where she lacks licensure targeting clients, as a "lawyer," in search of legal help alongside Recipient's outside counsel.

Recipient may in fact have good reason for employing so much deception. The contents of the subpoena response may implicate one of Recipient's valued clients, Scott Breitenstein—

who runs hundred of extortion-driven websites—not only in unlawful activity that violates numerous civil codes, but in criminal activity that could impact Recipient in multiple ways. Although they later re-appeared, two of the sites listed in Exhibit A to the subpoena were possibly seized by the United States Department of Homeland Security, Immigrations and Customs Enforcement (ICE), and/or the United States Department of Justice in late June 2018 for the stated crime of criminal copyright infringement in violation of 18 U.S.C. §§ 981 and 2323. Although this objection has never been raised by Recipient, revealing the requested server logs could therefore reveal more about the circumstances surrounding those alleged crimes. (If a case has been opened in a federal district court regarding this asset seizure, the case number remains unknown and possibly under seal.) To the extent that counsel for Recipient are aware of or even complicit in criminal activity in connection with Requestor's subpoena, that information should be divulged to the Court, as attorney-client privilege would not apply.

Regardless of the murky circumstances surrounding the seizure of certain sites, Recipient and its counsel should be forced to pay some sort of penalty for this type of evasive, obstructionist, and unlawful behavior. "Civil contempt proceedings may yield a conditional jail term or fine." *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565 (1978). There is no legitimate excuse for Recipient's handling of this matter, and this Court has recently viewed the lack of such an excuse in the face of a "prima facie showing of the violation" as the only relevant factor in determining whether contempt sanctions should be imposed. "[T]he test is not whether defendants made a good faith effort at compliance but whether 'the defendants took all reasonable steps within their power to comply with the court's order.'" *Local 1982, Int'l Longshoremen's Assn. v. Midwest Terminals of Toledo, Int'l, Inc.*, Case No. 3:12-cv-01384-JJH (N.D. Ohio, February 16, 2018), citing *Glover v. Johnson*, 138 F.3d 243 (6th Cir. 1998) and *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991).

As to the defense that counsel for Recipient are not technically parties to this case, "It is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it. The Supreme Court has long recognized that a person, 'not a party to the suit, [may be] guilty of contempt for violation of an order of that court, made in such suit, and imposing a fine for such contempt.' *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 325, 24 S.Ct. 665, 48 L.Ed. 997 (1904)." *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F. 3d 507 (8th Cir. 2000).

Recipient is apparently under the impression that subpoena compliance is optional and a trivial matter. Its principals and counsel should be dissuaded of their mistaken notion.

WHEREFORE, for all of the foregoing reasons, Requestor requests that the Court grant his motion; impose contempt sanctions on Recipient and its counsel Jennifer Lynn Suarez, Eugene Rome, Sridavi Ganesan; and compel Recipient to comply with the Court's subpoena.

Respectfully submitted this 13th day of August, 2018.

_____
Aaron Greenspan
20560 Shelburne Road
Shaker Heights, OH 44122-1941
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

## CERTIFICATE OF LOCAL RULE 7.1(f) COMPLIANCE

I, Aaron Greenspan, hereby certify that this document complies with Local Rule 7.1(f). Upon information and belief, this case has been assigned to the administrative, standard or unassigned track. The memorandum herein is fourteen (14) pages long, which is less than the twenty (20) page maximum for dispositive motions.

Aaron Greenspan
aaron.greenspan@plainsite.org

## CERTIFICATE OF MAILING AND SERVICE

I, Aaron Greenspan, hereby certify that this document was served through First Class Mail, as appropriate, on the case parties involved.

Aaron Greenspan
aaron.greenspan@plainsite.org